**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| IZEL KELLY, : | |
| : | Civil Action No. 03-2536 (SRC) |
| Petitioner, : | |
| : | |
| v. : | |
| : | **OPINION** |
| ROY L. HENDRICKS, et al., : | |
| : | |
| Respondents. : | |
| : | |

**APPEARANCES:**

> IZEL KELLY, Petitioner <u>Pro</u> <u>Se</u>
> #259756/981056A
> New Jersey State Prison
> P.O. Box 861
> Trenton, New Jersey 08625

> LINDA K. DANIELSON, ESQ.
> Office of the NJ Attorney General
> Division of Criminal Justice, Appellate Bureau
> P.O. Box 086
> Trenton, New Jersey 08625
> Attorneys for Respondents

**CHESLER, District Judge**

This matter is before the Court on petitioner Izel Kelly's application for habeas corpus relief under 28 U.S.C. § 2254. For the reasons stated below, the petition for habeas relief will be denied for failure to make a substantial showing of a federal statutory or constitutional deprivation.

I.  <u>BACKGROUND</u>

A.  <u>Procedural History</u>

Petitioner, Izel Kelly ("Kelly"), is presently confined at the New Jersey State Prison in Trenton, New Jersey, serving a 70-year prison sentence with a 30-year period of parole ineligibility for felony murder and first degree robbery.

Kelly was tried before a jury in February 1994.  A judgment of conviction was entered on March 25, 1994.  He appealed his conviction, and the Appellate Division affirmed on June 13, 1997, <u>State v. Kelly</u>, 302 N.J. Super. 145 (App. Div. 1997).  The New Jersey Supreme Court denied certification on September 14, 1998, <u>State v. Kelly</u>, 156 N.J. 409 (1998).

Kelly thereafter filed a petition for post-conviction relief ("PCR"), which was heard by the Honorable James A. Kennedy, J.S.C., on December 8, 2000, and denied on December 14, 2000.  The Appellate Division affirmed denial of relief on May 3, 2002.  The New Jersey Supreme Court denied certification on November 7, 2002.

Kelly then filed this federal habeas petition on or about May 20, 2003.  The respondents answered the petition and provided the relevant state court record on October 9, 2003.

B.  <u>Factual Background</u>

The facts of this case were recounted below and this Court, affording the state court's factual determinations the

2

appropriate deference under 28 U.S.C. § 2254(e)(1), will simply

reproduce the New Jersey Appellate Division's factual recitation:

On the morning of January 20, 1992, the body of Petronillo Jiminez, a man of Mexican descent, was found dead, laying on the railroad tracks at the Freehold bus station with his jacket pulled up over his head and his torso exposed. His jacket pockets were turned inside out. According to the medical examiner's report, Jiminez died from blunt trauma to the head and neck region with hypothermia as a significant factor.[1]

The previous day Pedro Lopez Garcia met Jiminez at a Freehold laundromat. They spent the day together and eventually ended up at Garcia's apartment, where Jiminez consumed approximately eight beers. Around 10:30 p.m., Jiminez and Garcia left the apartment.

As they exited the apartment building, Garcia noticed a black man, wearing a green jacket and work boots, knocking on the door. Jiminez and Garcia proceeded to walk to the Freehold bus station. Jiminez was going to take a bus home and Garcia was taking a bus to work in Adelphia.

Garcia walked behind the station, near the train tracks. Two black men approached him; one from behind and one in front and asked him for money. Garcia remembered the man in front of him as the same man who was knocking at the apartment door, wearing the same boots and jacket. Jiminez told the men that they did not have any money and they left.

These events were corroborated by another witness, who described the black men as being six-feet-two inches tall; one wearing a gray colored coat and another wearing a darker colored coat, both with hooded sweat shirts. This witness took the same bus with Garcia at 11:00 p.m. As the bus was departing, he saw one of the black men approach Jiminez.

Around 11:15 p.m., Tarshell Parrish drove by the bus station. She noticed two black men, who were about six feet tall with dark skin, and a Mexican man in the last parking lot next to the bus station. One black man was standing about a foot and a half in front of the Mexican man and one

---

[1]  On the night of January 19, 1992, temperatures ranged between seven and ten degrees Fahrenheit.

was standing behind.  She testified that the Mexican man was "holding his palms up and shaking his head." She did not see anyone else in the area and kept driving.

At 6:48 a.m. on January 20, 1992, a patrolman from the Freehold Borough Police Department was dispatched to the bus station to investigate a report that a man was laying on the tracks and was possibly dead.  Located near the body was one of the victim's matching gloves, a broken wine bottle, a dollar bill, a cassette tape and a bottle of breath spray. Another patrolman observed a glove which appeared similar to one worn by defendant's brother James Melvin Kelly in Municipal Court two or three days earlier.

A search warrant was issued for the Kelly residence and during the search, defendant Izel Kelly and his brother James were asked if they would answer some questions at the police station, and they agreed to do so.  Izel implicated himself in the robbery, explaining how on the previous evening, he approached two Mexican men on the bus platform and asked for a quarter to use the telephone.  Later, he said he and his brother again approached one of the Mexican men, who appeared drunk and demanded money.  Izel stated that he stood behind the man while his brother stood in front.  According to Izel's statement, the Mexican dropped his wallet and James picked it up and they ran away.

James gave a similar statement to police that night.  James eventually pleaded guilty to aggravated manslaughter in connection with the Jiminez homicide and received a twenty year sentence with ten years parole ineligibility.  At the plea hearing, he testified that his brother held the victim's arms.

At trial, James Kelly testified that his brother had nothing to do with the robbery.  He stated that although Izel did ask the two Mexican men for money, he returned home after making a telephone call.  James admitted that he robbed one of the Mexican men and punched him twice in the jaw.  James thought that he knocked the man out.  According to James's testimony, another man, Johnnie Jackson, held the victim's arms while he searched the victim's pockets.  James admitted losing his glove during the incident.

4

(Appellate Division Opinion, decided June 13, 1997, R6[2] at pp. 2-5).

## II.  CLAIMS FOR HABEAS RELIEF

Kelly raises the following claims in his federal habeas petition:[3] (1) Petitioner was denied a fair trial due to the judge's refusal to question potential jurors on racial prejudice; (2) Petitioner was denied effective assistance of counsel due to multiple errors by trial counsel; (3) Petitioner was denied effective assistance of appellate counsel; (4) the trial court denied petitioner a required specific jury instruction on identification.

## III.  STANDARD GOVERNING REVIEW OF § 2254 CLAIMS

The Court recognizes that a pro se pleading is held to less stringent standards than more formal pleadings drafted by

---

[2]  Respondents' exhibits are numbered from 1 through 31, and will be reference in this Opinion as "R1-31".

[3]  The State contends that some of petitioner's claims are unexhausted.  However, to the extent any of the claims were not exhausted in state court, this Court may opt to review such claims, and deny them on the merits pursuant to 28 U.S.C. § 2254(b)(2).  Section 2254(b)(2) provides that "[a]n application for writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."  Here, the respondents have fully addressed each of petitioner's claims on the merits.  Thus, for the reasons discussed below, the Court will deny this petition on the merits, pursuant to 28 U.S.C. § 2254(b)(2), because "it is perfectly clear that an applicant does not raise even a colorable federal claim."  Lambert v. Blackwell, 134 F.3d 506, 514-15 (3d Cir. 1997), cert. denied, 532 U.S. 919 (2001).

attorneys.  Estelle v. Gamble, 429 U.S. 97, 106 (1976); Haines v. Kerner, 404 U.S. 519, 520 (1972).  Thus, a pro se habeas petition should be construed liberally and with a measure of tolerance. See Royce v. Hahn, 151 F.3d 116, 118 (3d Cir. 1998); Duarte v. Hurley, 43 F. Supp.2d 504, 507 (D.N.J. 1999).  Because Kelly is a pro se litigant, the Court will accord his petition the liberal construction intended for pro se petitioners.

Under § 2254, as amended by the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), federal courts in habeas matters must give considerable deference to determinations of the state trial and appellate courts.  See 28 U.S.C. § 2254(e); Duncan v. Morton, 256 F.3d 189, 196 (3d Cir.), cert. denied, 122 S.Ct. 269 (2001); Dickerson v. Vaughn, 90 F.3d 87, 90 (3d Cir. 1996)(citing Parke v. Raley, 506 U.S. 20, 36 (1992)).  Section 2254(d) sets the standard for granting or denying a habeas writ:

> (d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

In Williams v. Taylor, 529 U.S. 362 (2000), the Supreme Court explained that subsection (d)(1) involves two clauses or conditions, one of which must be satisfied before a writ may issue.  The first clause, or condition, is referred to as the "contrary to" clause.  The second condition is the "unreasonable application" clause.  Williams, 529 U.S. at 412-13.  In the "contrary to" clause, "a federal court may grant the writ if the state arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts."  Id.  Under the "unreasonable application" clause, a federal court may grant the writ if "the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of [the petitioner's] case."  Id. at 413.  Habeas relief may not be granted under the "unreasonable application" condition unless a state court's application of clearly established federal law was objectively unreasonable; an incorrect application of federal law alone is not sufficient to warrant habeas relief.  Id. at 411.  See also Werts v. Vaughn, 228 F.3d 178, 197 (3d Cir. 2000), cert. denied, 532 U.S. 980 (2001); Matteo v. Superintendent, SCI Albion, 171 F.3d 877, 891 (3d Cir. 1999), cert. denied sub nom Matteo v. Brennan, 528 U.S. 824 (1999).

7

Consonant with Williams, the Third Circuit has held that §
2254(d)(1) requires a federal habeas court to make a two step
inquiry of the petitioner's claims.  First, the court must
examine the claims under the "contrary to" provision, identify
the applicable Supreme Court precedent and determine whether it
resolves petitioner's claims.  See Werts, 228 F.3d at 196-97;
Matteo, 171 F.3d at 888-891.  If the federal court determines
that the state court's decision was not "contrary to" applicable
Supreme Court precedent, then the court takes the second step of
the analysis under § 2254(d)(1), which is whether the state court
unreasonably applied the Supreme Court precedent in reaching its
decision.  Werts, 228 F.3d at 197.

This second step requires more than a disagreement with the
state court's ruling because the Supreme Court would have reached
a different result.  Id.  AEDPA prohibits such de novo review.
Rather, the federal habeas court must determine whether the state
court's application of the Supreme Court precedent was
objectively unreasonable.  Id.  In short, the federal court must
decide whether the state court's application of federal law, when
evaluated objectively and on the merits, resulted in an outcome
that cannot reasonably be justified under existing Supreme Court
precedent.  Id.; see also Jacobs v. Horn, 395 F.3d 92, 100 (3d
Cir. 2005).

Finally, federal courts are required to apply a "presumption of correctness to factual determinations made by the state court." Id.; see also 28 U.S.C. § 2254(e)(1). The Third Circuit has ruled that this presumption of correctness based upon state court factual findings can only be overcome by clear and convincing evidence. See Duncan, 256 F.3d at 196 (citing 28 U.S.C. § 2254(e)(1)). Consequently, a habeas petitioner "must clear a high hurdle before a federal court will set aside any of the state court's factual findings." Mastracchio v. Vose, 274 F.3d 590, 597-98 (1st Cir. 2001).

IV.   ANALYSIS

A.   No Jury Voir Dire on Racial Prejudice

Kelly first asserts that the trial court denied him a fair trial by refusing to voir dire potential jurors on the issue of racial prejudice. This prevented petitioner from intelligently exercising his peremptory challenges. There were two specific questions which Kelly's counsel requested the court to ask the potential jurors during voir dire: (1) Have you ever had any experience in which you were asked for money in public, and if so what was the race of the person? (2) Have you ever had any unpleasant experience with a black person which would cause you to view black persons generally in an unfavorable light? The court declined to ask these questions on voir dire, stating: "I will not give either question. I think it's bringing, unduly

9

bringing race into the case.  It doesn't belong in the case, and I will not give it over the objection of Mr. Perrone."  (February 8, 1994 Trial Transcript, R19 2:18-3:5).

Kelly raised this claim on direct appeal.  The Appellate Division noted that while the trial judge had refused to give the two specific questions as requested by Kelly, the judge did question the jurors in general terms regarding bias.  (R6, at pg. 5).  The Appellate Division further observed that four groups of potential jurors were called before the jury was finally selected.  Seventy-five (75) jurors had been excused, 46 of them for cause.  Of the jurors excused for cause, 11 of them stated that they were either victims of a crime or knew someone who had been a victim, and could not be impartial.  Two other jurors were excused for cause because they told the judge they could not be impartial because the defendant was black.  (Id.).

Jury voir dire questions are matters of judicial discretion. Rosales-Lopez v. United States, 451 U.S. 182, 189 (1981).  The Supreme Court has stated that "[t]here is no presumption of juror bias for or against members of any particular racial or ethnic groups."  Id. at 190.  However, New Jersey state courts have recognized "that jurors may be racially or ethnically biased against the defendant, even in the absence of an explicitly racially divisive factual situation."  State v. McDougald, 120 N.J. 523, 553 (1990).  Thus, in cases where there is a racial or

ethnic difference between the victim and the defendant, at the
defendant's request the trial court should ask prospective jurors
on voir dire if the disparity in race will affect their ability
to be impartial.  Rosales-Lopez, 451 U.S. at 191.  Refusal to
question prospective jurors about racial attitudes is an error of
constitutional magnitude where racial issues are "inextricably
bound up with the conduct of the trial." Ristaino v. Ross, 424
U.S. 589, 597 (1976).  It is also constitutional error where
there exists "substantial indications of the likelihood of racial
or ethnic prejudice affecting the jurors in a particular case."
Rosales-Lopez, 451 U.S. at 190.  Moreover, even if the refusal is
not of constitutional dimension, the Supreme Court has found it
to be an abuse of discretion requiring reversal "where the
circumstances of the case indicate that there is a reasonable
possibility that racial or ethnic prejudice might have influenced
the jury."  Id. at 191.

In line with these federal precedents, the Appellate
Division found that race was not a factor in this case, and thus,
the trial judge's refusal to ask specific questions about
possible racial bias was not an error of constitutional dimension
simply because Kelly is a black person.  (R6 at pp. 6-8).  The
appellate court did find that "it was error for the judge not to
have made more of an inquiry into potential racial bias," but
this error was not "clearly capable of producing an unjust

11

result." (R6 at pg. 8). The Appellate Division based this conclusion on the fact that the limited questions on this issue as asked by the trial judge on voir dire were mostly effective: seven prospective jurors indicated they could not be impartial because either they or someone they knew had been victims of a robbery or mugging, and two jurors indicated that they could not be impartial because defendant was a black man. (<u>Id</u>.). Thus, the court held that even if there was error in refusing to ask specific questions on racial bias, it was not capable of leading the jury to an unjust verdict. The jury knew Kelly had admitted his involvement in the robbery from his statement to the police, and Kelly's brother had initially implicated him. (R6 at pg. 9).

This Court finds that the state court's decision was not contrary to established federal law. In <u>Ristaino</u>, the Supreme court established that even in a black-on-white crime, there is no constitutional right to have questions on racial bias included in the voir dire. 424 U.S. 594-95, 597-98; <u>Rosales-Lopez</u>, 451 U.S. at 190 (there is no <u>per</u> <u>se</u> constitutional rule in cases where the accused is black and the victim is white that requires an inquiry as to racial bias). <u>Ristaino</u> responded to the Supreme Court case, <u>Ham v. South Carolina</u>, 409 U.S. 524 (1973), in which the Court held it was a constitutional violation not to include voir dire on racial prejudice when requested by counsel. In <u>Ham</u>, the Court found that race was an inextricable factor in the trial

12

because the defendant, a black civil rights activist who was arrested on a drug violation, claimed that he was targeted by police because he was black and was involved in civil rights activities.  409 U.S. at 525, 527.  However, in <u>Ristaino</u>, the Court made clear that there is no across-the-board requirement for jury voir dire on racial prejudice, but instead, is only applicable in very specific circumstances, such as in <u>Ham</u>, where racial issues are "inextricably bound up with the conduct of trial."  <u>Ristaino</u>, 424 U.S. at 597.  "<u>Ham</u> ... did not announce a new broad constitutional principle requiring that [such] questions ... be put to prospective jurors in all State criminal trials when the defendant is black."  <u>Id</u>. at 594.  <u>See also</u> <u>United States v. Brown</u>, 938 F.2d 1482, 1485 (1st Cir.)(specific questions on jury voir dire as to racial bias is not compulsory unless there is substantial evidence of the likelihood of racial or ethnic prejudice), <u>cert</u>. <u>denied</u>, 502 U.S. 992 (1991); <u>Otsuki v. Dubois</u>, 994 F. Supp. 47, 53 (D. Mass. 1998)(mere fact that defendant and victims were members of different races did not implicate constitutional imperative to voir dire jury on racial prejudice); <u>Purnell v. Hendricks</u>, Civil No. 99-1651 (JEI), 2000 WL 1523144 (D.N.J. 2000).

Here, the state courts found that race was not a factor in the case, nor was it "inextricably bound up with the conduct of the trial."  <u>Ristaino</u>, 424 U.S. at 597.  Moreover, the Appellate

Division found that the trial court's voir dire, while not specific to the requested questions proffered by defense counsel, was sufficient to elicit racial bias as to two prospective jurors, who were then excused for cause.  The trial court's general questions as to impartiality was sufficient to elicit prejudice under the circumstances in this case.  Thus, the state court's holding was not contrary to constitutional law, nor did it involve an objectively unreasonable application of clearly established federal law.  Further, the state court's decision was based on a reasonable determination of the facts and circumstances in this case, namely, that there were no racial issues "inextricably bound up with the conduct of the trial." Ristaino, 424 U.S. at 597.  Kelly was provided a fair and impartial jury.  Thus, Kelly has not demonstrated that the state court decisions, when evaluated objectively and on the merits, resulted in an outcome that cannot be reasonably justified. Matteo, 171 F.3d at 891.  Accordingly, this claim will be denied as substantively without merit.

B.   Ineffective Assistance of Trial Counsel

     Next, Kelly asserts that his trial counsel was constitutionally ineffective because he failed to interview or call Dr. Good to testify at trial with respect to the issue of causation of death.  He also claims that the prosecutor failed to provide Dr. Good's report in violation of Brady v. Maryland, 373

14

U.S. 83 (1963), and that defense counsel was deficient in failing to investigate and find this report before trial.  Kelly further alleges that counsel's performance was deficient because he failed to call Dr. Baden to testify at trial on the issue of causation of death.  Finally, Kelly contends that counsel was ineffective in failing to request a specific jury charge on probable consequence with respect to the issue of whether the victim's death was a probable consequence of the robbery, when there was evidence that the victim was intoxicated and was exposed to frigid weather.

The "clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), is the standard for ineffective assistance of counsel as enunciated in Strickland v. Washington, 466 U.S. 668 (1984).  Under Strickland, a petitioner seeking to prove a Sixth Amendment violation must demonstrate that his counsel's performance fell below an objective standard of reasonableness, assessing the facts of the case at the time of counsel's conduct.  Id. at 688-89; Jacobs v. Horn, 395 F.3d 92, 102(3d Cir. 2005); Keller v. Larkins, 251 F.3d 408, 418 (3d Cir.), cert. denied, 534 U.S. 973 (2001).  Counsel's errors must have been "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Strickland, 466 U.S. at 688.  "In any case presenting an ineffectiveness claim, the performance inquiry must be whether

15

counsel's assistance was reasonable considering all the circumstances." Id.  The Supreme Court further explained:

> Judicial scrutiny of counsel's performance must be highly deferential.  It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.  A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

Id. at 689 (citations omitted); see also Virgin Islands v. Wheatherwax, 77 F.3d 1425, 1431 (3d Cir.), cert. denied, 519 U.S. 1020 (1996).

If able to demonstrate deficient performance by counsel, petitioner must also show that counsel's substandard performance actually prejudiced his defense.  Strickland, 466 U.S. at 687. Prejudice is shown if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  Id. at 694.  The reviewing court must evaluate the effect of any errors in light of the totality of the evidence.

16

Id. at 695-96.  Thus, the petitioner must establish both
deficient performance and resulting prejudice in order to state
an ineffective assistance of counsel claim.  Id. at 697.  See
also Jacobs, 395 F.3d at 102; Keller, 251 F.3d at 418.

    1.  *Failure to Investigate and Call Witnesses*

    "[A]n attorney must investigate a case, when he has cause to
do so, in order to provide minimally competent professional
representation."  United States v. Kauffman, 109 F.3d 186, 190
(3d Cir. 1997); Lewis v. Mazurkiewicz, 915 F.2d 106, 111 (3d Cir.
1990)(counsel has a duty to investigate or to make a reasonable
decision that makes particular investigations unnecessary).  When
assessing an ineffectiveness claim based on failure to
investigate, a court must assess the decision not to investigate
"for reasonableness in all the circumstances, applying a heavy
measure of deference to counsel's judgments."  Strickland, 466
U.S. at 691; Kimmelman v. Morrison, 477 U.S. 365, 384 (1986); see
also Duncan v. Morton, 256 F.3d 189, 201 (3d Cir.), cert. denied,
534 U.S. 919 (2001).  "[S]trategic choices made after less than
complete investigation are reasonable precisely to the extent
that reasonable professional judgments support the limitations on
investigation."  Strickland, 466 U.S. at 691-92.  Even if counsel
was deficient in his decision not to investigate, a petitioner
must show a reasonable likelihood that, but for the deficiency,

the result of the proceeding would have been different.  Lewis,
915 F.2d at 115.

After reviewing the record, this Court finds nothing that
would support a blanket argument that Kelly's counsel failed to
investigate and prepare a defense for trial.  On the specific
issue of expert testimony relating to causation of death, which
was raised in Kelly's state PCR proceedings, the PCR court found
that counsel had hired an expert, a renowned forensic medical
examiner, Dr. Michael Baden, on the causation of death issue.
However, counsel declined to call Dr. Baden at trial.  The PCR
court found that there was no prejudice to petitioner in this
instance that would have resulted in a different outcome at
trial.  The court stated that Dr. Baden's report on the cause of
death did not support Kelly's contention and was not helpful to
petitioner's case.  Thus, counsel's decision not to call Dr.
Baden to testify could be construed as a legitimate and
reasonable trial tactic.  (December 14, 2000 PCT, R31 6:1-10).

Likewise, Kelly fails to show how the testimony of Dr. Good
would have changed the outcome of trial.  The trial court had
concluded that the findings of both Dr. Peacock and Dr. Good were
essentially the same, except that Dr. Good did not reach a
conclusion as to the cause of death.[4]  (February 15, 1994 Trial

---

[4] Initially, Dr. Peacock did not state a conclusion as to
cause of death, pending the results of certain specimen tests he
had ordered for this purpose.  While he was awaiting the results,

Transcript, R24 36:1-38:18).  Thus, although the court was
willing to issue a court order to have Dr. Good testify at trial,
defense counsel declined the offer based on Dr. Good's antagonism
about appearing in court.  Counsel explained to the court that
Dr. Good would be a hostile witness, and thus unlikely to offer
testimony helpful to defendant.  (February 17, 1994 Trial
Transcript, R26 19:19-20; February 16, 1994 Trial Transcript, R25
261:1-10).  In this regard, it appears that counsel's decision
was again a tactical choice.

    Moreover, to the extent the decision not to call these
witnesses at trial might constitute deficient representation, the
state court found that the absence of such testimony did not
prejudice defendant.  Because the reports of these medical
examiners/experts did not differ substantially, it is unlikely
that either Dr. Baden or Dr. Good (who would have been a hostile
witness) would have provided testimony that could have resulted
in a different outcome at trial.  Thus, Kelly's ineffective

---

the State had Dr. Good, a state medical examiner, examine the
case.  (February 10, 1994 trial Transcript, R22 81:7-82:12;
149:1-25).  Dr. Peacock testified that Dr. Good likewise did not
reach a conclusion as to cause of death, although "he was leaning
toward a self-inflicted mode" meaning "perhaps a fall." (February
10, 1994 Trial Transcript, R22 150:7-9; 151:6).  Dr. Peacock
eventually determined the cause of death to be "blunt trauma to
the head and neck, and ... other significant conditions
contributing to death hypothermia which is low body temperature."
(February 10, 1994 Trial Transcript, R22 92:22-25).

19

assistance of counsel claim on this issue fails the second prong of the <u>Strickland</u> test.

In sum, this Court finds nothing to indicate that the state court decisions on this issue were based on an unreasonable application of the facts in light of the evidence presented at trial.  Nor were the decisions contrary to established federal law.  The state PCR court found that counsel's decision not to call the expert witnesses was a strategic decision.  The court also found that counsel's decision, even if deficient, failed to satisfy the second prong of prejudice.  Kelly has failed to show how the testimony of these witnesses would have changed the outcome of his case.  Thus, Kelly has not demonstrated that the state court decisions of the PCR and appellate courts, when evaluated objectively and on the merits, resulted in an outcome that cannot be reasonably justified.  <u>Matteo</u>, 171 F.3d at 891.  Accordingly, this claim of ineffective assistance of counsel is without merit.

2.  *Counsel's Failure to Uncover Dr. Good's Report*

Petitioner asserts that counsel was deficient because he failed to uncover Dr. Good's report prior to trial.  Even if the Court accepts the argument that counsel's failure to uncover the report constitutes deficient performance, for the reasons stated above, there is no satisfaction of the second prong under <u>Strickland</u>.  Dr. Good's report does not exculpate petitioner, nor

would his testimony at trial have altered the outcome of the verdict.  Accordingly, there is no merit to this particular claim.

Kelly also alleges that this was a <u>Brady</u> violation on the part of the prosecutor, which counsel failed to rectify.  In order to establish a <u>Brady v. Maryland</u> non-disclosure violation, the defense must demonstrate that: (1) the prosecution failed to disclose the evidence; (2) the evidence was of a favorable character to the defendant; and (3) the evidence was material. <u>Moore v. Illinois</u>, 408 U.S. 786, 794-95 (1972).

Here, defense counsel moved for a dismissal of the indictment, or alternatively, for a mistrial, based on a claim that the prosecutor's failure to initially disclose Dr. Good's report was a <u>Brady</u> violation.  (R24 8:12-19).  However, in reviewing the report, the court found that there was nothing exculpatory in the report, which negates the second condition required to establish a <u>Brady</u> violation.  (R24 42:14-17). Second, the court determined that although the prosecutor had a duty to disclose the report, she could not disclose a report that she did not have until that day.  (R24 42:20-43:16).  Defense counsel had a copy of the report and he had the opportunity beforehand to speak to Dr. Good.  The court also gave counsel the opportunity to call Dr. Good to testify at trial.  Consequently,

the court denied the motions to dismiss the indictment and for a mistrial.

For the reasons stated above, this Court finds no deficient performance by defense counsel in this instance.  Counsel dutifully made a motion to dismiss the indictment or have a mistrial declared, which was unsuccessful because the trial court determined that the report was not exculpatory, and that the prosecutor did not fail to disclose something she did not have at the time.  This Court fails to find anything to indicate that the state court's decision on this issue was based on an unreasonable application of the facts in light of the evidence presented at trial.  Nor was the decision contrary to established federal law. Thus, Kelly has not demonstrated that the state court decision, when evaluated objectively and on the merits, resulted in an outcome that cannot be reasonably justified.  <u>Matteo</u>, 171 F.3d at 891.

3.  *Failure to Request Jury Charge on Probable Consequences*

Next, Kelly asserts that his counsel was deficient for failing to request a specific charge on probable consequences as to the issue of cause of death.  Respondents assert that this claim was not exhausted in the state courts.

Nevertheless, it is plain from reading the jury charges that the court adequately instructed the jury on this issue.  In pertinent part, the court read:

22

The second and third elements require the State to establish that the victim's death was caused by the defendant and was caused during the commission of or attempt to -- attempt to commit or flight after committing or attempting to commit the robbery.

In order to meet its burden of proof as to the second and third elements, the State must prove beyond a reasonable doubt the following:

First, that but for the defendant's conduct or the conduct of one or more others with whom the defendant participated in the commission of or attempt to commit or flight after committing or attempting to commit robbery the victim would not have died.

In other words, that the victim's death would not have occurred without the commission of the robbery.

Second, that the victim's death was a probable consequence of the commission of or attempt to commit or flight after committing or attempting to commit the robbery.

In order for the death to be a probable consequence of the robbery, the death must not have been too remote or too accidental in its occurrence or too dependent on other volitional acts to have a just bearing on the defendant's liability or the gravity of his offense.

In other words, you must decide if the State has proven beyond a reasonable doubt that under all the circumstances the death did not occur in such an unexpected or unusual manner that it would be unjust to find the defendant responsible for the death.

(February 18, 1994 Transcript, Jury Charge, R27 31:1-32:3).

As this charge specifically instructed the jury on the issue of probable consequences, the Court finds petitioner's claim on this issue of deficient performance of trial counsel to be absolutely baseless.  The claim will be denied for lack of merit.

C.   Ineffective Assistance of Appellate Counsel

Kelly broadly asserts that his appellate counsel was ineffective for failing to communicate with him and examine the record for direct appeal.  He also contends that appellate counsel was deficient in failing to raise on appeal the trial court's denial of a special jury charge on identification.  This issue was raised on direct appeal and was rejected by the Appellate Division.  Accordingly, this specific claim alleging failure to raise the lack of an identification charge on appeal is baseless.  Finally, it appears that petitioner is alleging that counsel was ineffective for failing to raise issues of trial counsel's incompetency in abandoning the testimony at trial of Dr. Baden and Dr. Good.  These claims were raised in the state PCR petition.[5]  Thus, to the extent Kelly contends that his PCR counsel was ineffective in the state PCR proceedings, such claim is not cognizable in a federal habeas petition and will be dismissed.  28 U.S.C. § 2254(I).

The only claim subject to federal habeas review here is the general claim that appellate counsel did not communicate with petitioner or fully examine the trial record.  Both the state PCR court and the Appellate Division found no merit to Kelly's claim.

---

[5]  Generally, claims of ineffective assistance of trial counsel are not generally raised on direct appeal because it requires the appellate court to look beyond the bounds of the record and the evidence presented at trial.

The PCR court specifically stated that petitioner failed to show "what could have been communicated to the appellate attorney that would have changed the outcome of the appeal." (R31 8:3-5). The court also found the claim that appellate counsel failed "to completely read the transcripts or understand the issues" to be vague and conclusory, and factually unsupported. (R31 8:14-22). The Appellate Division affirmed substantially for the reasons set forth in the PCR oral opinion. (R12 at pg. 3).

Claims of ineffective assistance of appellate counsel are evaluated under the Strickland standard previously discussed. See Wright v. Vaughn, 2004 WL 1687865, *6, n.10 (E.D. Pa. July 26, 2004). In order to prevail on a claim that appellate counsel was ineffective, Kelly must show that (1) counsel's performance fell below an objective standard of reasonableness, and (2) there was a reasonable probability, but for counsel's deficiency in raising the arguments on appeal, that the conviction would have been reversed on appeal. See Buehl v. Vaughn, 166 F.3d 163, 173-74 (3d Cir. 1999), cert. dismissed, 527 U.S. 1050 (1999).

Based on review of the record, this Court agrees with the state courts that petitioner failed to establish deficient performance by appellate counsel. Kelly also failed to show how any alleged failure by appellate counsel would have had any reasonable potential for affecting the outcome of the appeal. Therefore, this Court cannot conclude that the determination of

this issue by the state courts resulted in a decision that was contrary to, or involved an unreasonable application or determination of law or fact. <u>Williams v. Taylor</u>, <u>supra</u>. Accordingly, the Court will deny federal habeas relief on this claim.

D.   <u>The Trial Court Declined to Charge the Jury on Identification</u>

Finally, Kelly asserts that the trial court erred in failing to give a special jury instruction on identification.  This claim was raised on direct appeal.  The Appellate Division found that:

> No witness identified Izel at the trial as one of the assailants, although witnesses were able to identify articles of clothing worn by both men.
>
> We have carefully considered Kelly's argument concerning identification and conclude that it is wholly without merit. [citation omitted] Not only was there no request for an identification charge, but identification could have played no role in the jury's determination.  Identification of Kelly by any specific witness was never an issue.

(R6 at pp.5-6).

Questions relating to jury charges are normally matters of state law and are not cognizable in federal habeas review.  <u>See</u> <u>Engle v. Isaac</u>, 456 U.S. 107 (1982); <u>Henderson v. Kibbe</u>, 431 U.S. 145 (1977); <u>Zettlemoyer v. Fulcomer</u>, 923 F.2d 284, 309 (3d Cir.), <u>cert.</u> <u>denied</u>, 502 U.S. 902 (1991); <u>Grecco v. O'Lone</u>, 661 F. Supp. 408, 412 (D.N.J. 1987)(Thompson, J.).  Only where the jury instruction is "so prejudicial as to amount to a violation of due process and fundamental fairness will a habeas corpus claim lie." <u>Id</u>.

26

"[T]he fact that [an] instruction was allegedly incorrect under state law is not a basis for habeas relief." Estelle v. McGuire, 502 U.S. at 71-72.  Rather, the district court must consider "'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process,' ... not merely whether 'the instruction is undesirable, erroneous, or even universally condemned.'" Henderson, 431 U.S. at 154 (quoting Cupp v. Naughten, 414 U.S. 141, 146-47 (1973)). Moreover, "[t]he burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state's court judgment is even greater than the showing required to establish plain error on direct appeal." Id.

Here, the state appellate court determined that identification was never an issue and therefore, a jury charge on identification would have played no role in the jury's determination.  Further, defense counsel never requested such a charge.  This Court finds that there was no need for the trial court to sua sponte charge the jury on the specific issue of identification when it was not an issue in the case.  Moreover, even if it was error not to charge the jury specifically on identification, the lack of such a charge did not affect the outcome of the trial.  There was sufficient evidence at trial to support the conviction, including Kelly's admitted involvement in

27

the robbery in a statement to the police, and his brother's prior
testimony that implicated Kelly in the robbery (the brother had
stated that Kelly held the victim's arms during the robbery).
Thus, at most, petitioner's claim of fault is based on omission,
which the Supreme Court has stated is less serious than a
misstatement of the law.  See Henderson, 431 U.S. at 155 ("An
omission, or an incomplete instruction, is less likely to be
prejudicial than a misstatement of the law").  Kelly fails to
point to a federal requirement that a specific instruction was
required in this instance; nor can he demonstrate that the lack
of the proposed charge deprived him of a defense which federal
law provided to him.  Johnson v. Rosemeyer, 117 F.3d 104, 110 (3d
Cir. 1997).

Therefore, this Court concludes that the absence of the
specific instruction on identification, when viewed in the
context of this case, did not so infect the trial with unfairness
as to violate Kelly's due process rights.  Accordingly, this
claim will be denied for lack of substantive merit.

## V.   CERTIFICATE OF APPEALABILITY

This Court next must determine whether a certificate of
appealability should issue.  See Third Circuit Local Appellate
Rule 22.2.  The Court may issue a certificate of appealability
only if the petitioner "has made a substantial showing of the
denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  For

the reasons discussed above, this Court's review of the claims advanced by petitioner demonstrates that he has failed to make a substantial showing of the denial of a constitutional right necessary for a certificate of appealability to issue.  Thus, this Court declines to issue a certificate of appealability pursuant to 28 U.S.C. § 2253(c)(2).

## CONCLUSION

For the above reasons, this Court finds that the § 2254 habeas petition should be denied on the merits and a certificate of appealability will not issue.   An appropriate Order follows.


_____s/_____
STANLEY R. CHESLER
United States District Judge

DATED:   October 28, 2005

29